# Jamison *et al. versus* Collins.
## Same *versus* Same.

1. In a writ of error under the reference law of April 22d 1874, Purd. Dig. 1939, the Supreme Court can hear and determine only questions of law arising upon bills of exception to the rulings of the judge relating to the evidence or the law of the case. It will not go behind his findings of fact, except where in a common-law trial before a jury the assignments of error are such as can be heard and determined before this court.

2. The superintendent of a corporation was given a draft, the proceeds of which were to be used for the benefit of the corporation. He went to a banking firm, one of the members of which was the treasurer of the corporation, and deposited with them the draft, the proceeds to be placed to his personal credit. The firm instead appropriated the proceeds to the payment of an indebtedness of the corporation to its treasurer. *Held*, that this was a misappropriation of the funds and that the firm was liable therefor.

January 29th 1877. Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON and WOODWARD, JJ. WILLIAMS, J., absent.

Error to the Court of Common Pleas, No. 2, of *Philadelphia county*: Of January Term 1876, Nos. 291, 292.

These were two actions of assumpsit, one brought by B. K. Jamison & Co. against Philip Collins, to recover overdrafts made by Collins on his bank account with plaintiffs; the other by Collins against Jamison & Co., to recover the proceeds of a draft which Collins alleged were misappropriated by Jamison & Co.

Both cases were submitted to the court, and a trial by jury dispensed with under the provisions of the Act of April 22d 1874, Pamph. L. 109, Purd. Dig. 1939.

[Jamison *v.* Collins.]

The following were the findings of fact and the conclusions of law as reported by Mitchell, J., who tried both cases:—

"1. In the spring and summer of 1871, the Central Improvement Company, a corporation under the laws of Pennsylvania, of which Philip Collins was superintendent, and B. K. Jamison, one of the firm of B. K. Jamison & Co., was treasurer, was engaged in building the Shenandoah Valley Railroad, in the state of Virginia.

"In the prosecution of this work, Collins, as superintendent, disbursed large amounts of money, and for convenience and safety in knowing what funds he had to draw on, he kept the greater part of his funds in his own individual name, and drew upon them by his individual checks. He also, from time to time, drew drafts upon the treasurer of the company, but not nearly to the same extent.

"Prior to July 1871, drafts and acceptances of the Pennsylvania Railroad Company to the amount of $45,000 had been delivered by the officers of the Central Improvement Company to Collins as superintendent, and Collins had had them discounted, deposited the proceeds to his individual credit, and drawn his checks upon them with no reference to the treasurer or to any other officer of the Improvement Company, and in every way treated them as his own individual property until he presented his accounts as superintendent, charging himself with the proceeds of such drafts, and claiming credit for his payments.

"2. In the latter part of July 1871, Collins was a creditor of the Central Improvement Company to a considerable amount, by reason of advances made by him, and then required more money to carry on the work in Virginia. He came to Philadelphia to procure funds, and a meeting took place at the office of the Pennsylvania Railroad Company, on August 1st 1871, at which were present Collins, Jamison, the treasurer of the Central Improvement Company, R. D. Barclay, the president of that company, J. M. Walker, a large stockholder, and Thomas A. Scott.

"At this meeting the Pennsylvania Railroad Company, acting by Mr. Scott, agreed to advance $25.000 more to the Central Improvement Company, if payment was guaranteed. A guarantee was executed by T. A. Scott, J. M. Walker and Collins, and thereupon R. D. Barclay, president of the Central Improvement Company, drew two drafts upon Thomas A. Scott for $10,000 each, and one for $5000, all dated August 1st 1871, at four months, to the order of B. K. Jamison, treasurer. These drafts were accepted by Scott, endorsed by Jamison as treasurer, and delivered to Collins at the same meeting.

"3. [I find as a fact, that it was the clear expectation, understanding and intent of all parties to this transaction, the officers of the Improvement Company, including Jamison, treasurer, one of the parties to this suit, Collins, and Scott, the acceptor, that the

acceptances, and the money to be raised by their discount, should go into the hands of Collins, to be used by him as superintendent for the Improvement Company, in the same manner that the previous acceptances of the Pennsylvania Railroad Company, amounting to $45,000, had been delivered to and used by him ; that this was the intention at the time is not explicitly denied by any one ; and even if the vague and unsatisfactory depositions of Mr. Barclay and Mr. Scott are construed to express a contrary intent, they are not of the slightest weight against their own acts at the time, the clear and uniform bearing of all the circumstances of the transaction, and the positive and convincing testimony of Mr. Collins.]

" 4. I find also as a fact, that in pursuance of this understanding and intention of all the parties at the said meeting, the acceptances were delivered to Mr. Collins and became his absolute legal property, subject only to the obligation to account thereafter to the Central Improvement Company for the application of the proceeds.

" 5. Between the adjournment of the meeting above referred to and August 3d, Collins brought the acceptances to the banking house of B. K. Jamison & Co., where he kept a deposit account in his individual name, and there delivered the acceptances to Mr. Jamison, with instructions to send them to the Allegheny National Bank, at Pittsburgh, to be discounted for him, in pursuance of an arrangement he had previously made with that bank. On the same day Collins said to Jamison & Co. that he must have money on these acceptances, as he was going to Virginia. Jamison & Co. agreed, and Collins thereupon drew his check upon his individual account for $5000, which was cashed by Jamison & Co. the same day. This check overdrew his account with Jamison & Co., as bankers, to the extent of about $2000, unless the acceptances were passed to his credit.

" These acceptances had not been stamped by the maker, and stamps were put on them by Mr. Jamison, and the cost, $12.50, was charged by Jamison & Co. to Collins, upon his individual account, on August 3d 1871, and on the same day the acceptances were forwarded by Jamison & Co. to the Allegheny National Bank, in a letter dated August 3d 1871, and were returned by that bank to Jamison & Co., in a letter dated August 8th 1871, asking for the endorsement of Collins, upon which a check would be sent for the proceeds. Collins, who was at this time in Virginia, was informed by Jamison & Co. of the refusal of the bank to discount the acceptances without his endorsement, went to Harrisburg and saw Mr. Mackey, the vice-president of the bank, made an arrangement by which his written guarantee was agreed to be accepted as equivalent to his endorsement, returned to Philadelphia, and gave the guarantee to Jamison & Co., with instructions to send it and the acceptances again to the bank at Pittsburgh, and when a letter should come from the bank to him to open it, sign his name to the

paper, and place the proceeds to his credit. Accordingly, the acceptances were again forwarded by Jamison & Co., with the guarantee of Collins, to the Allegheny National Bank, in a letter dated August 16th 1871. That bank discounted the acceptances, and remitted a draft for the proceeds, $24,388.89, dated August 17th 1871, on the Union Banking Company of Philadelphia, payable to the order of Philip Collins. This draft, enclosed in a letter dated August 17th 1871, addressed to Philip Collins, care of B. K. Jamison & Co., was received by Jamison & Co., who opened the letter, directed one of their clerks, J. H. Crossman, to endorse the name of Mr. Collins, and upon it, with that endorsement, received from the Union Banking Company, the drawees, the sum of $24,388.89, on August 19th 1871.

" 6. Up to this time no question had been made by Jamison & Co. or B. K. Jamison, treasurer of the Central Improvement Company, of the title of Collins to the Scott acceptances or their proceeds, nor had any intimation been given to Collins that his instructions to place the proceeds to his individual credit would not be obeyed. He had drawn his check for $5000 on the proceeds of the discount by anticipation, and it had been paid by Jamison & Co.; he had conducted the negotiations with the Allegheny Bank in his own name; the bank, according to Mr. Mackey's testimony, recognised no one else in the transaction, and it had remitted the proceeds of the discount by a check to his order, inclosed in a letter directed to him, in care of Jamison & Co. In all of his dealings with Jamison & Co., Collins had treated the acceptances as his property; had directed the application of the proceeds on the ordinary basis of a depositor dealing with a bank as his agents, and Jamison & Co. had, by acquiescence in that basis of dealing—by honoring his check for what would have been otherwise an overdrawing of his account to the extent of $2000, by charging the costs of the stamps to his account, and by their letters to the Allegheny Bank in reference to the discount—recognised the title of Collins, and their position as his agents.

" 7. In May 1871, however, a note of the Central Improvement Company for $15,000, endorsed by J. M. Walker, had been delivered to Collins, by the Central Improvement Company, to raise funds for the operations in Virginia under his direction. This note was discounted by B. K. Jamison & Co., for Collins, and the proceeds, $14,602,50, passed to his credit in his account with them as bankers. The note, however, was discounted without the endorsement of Collins, and so far as appears without any right of recourse to him. He had, however, informed them that he did not intend to draw the proceeds for some time, as he was already in advance to the Improvement Company, and did not intend to get any deeper. In fact, however, Collins did draw out most of the proceeds for his

[Jamison v. Collins.]

operations in Virginia, within thirty days.  There was no stipulation or agreement that he should not do so.

"This note fell due August 17th, and not being paid, was protested August 18th 1871.

"8. The sum of $24,388.89, proceeds of the Scott acceptances, was received by B. K. Jamison & Co., on August 19th 1871 (as already found at the close of paragraph 5), and was kept by them without any entry on their books (unless in a 'cash settlement book,' referred to by their bookkeeper, Bur, on page 9 of the printed testimony, but not produced) until August 23d, when it was, by direction of Mr. Jamison, placed to his credit in his account as treasurer of the Central Improvement Company, and on the same day his account as treasurer was debited with the note of the Central Improvement Company for $15,000, with Walker's endorsement, which had been discounted for Collins by the firm of B. K. Jamison & Co. in May.

"Under date of August 22d 1871 (the day before the entry was actually made in the books of Jamison & Co.) Mr. Jamison wrote to Collins as follows:—

"'I charge the protested note, $15,000, Central Improvement Company, up to their account, and credit them with proceeds of Scott acceptances loaned the company—$24,388.89.  After deducting the amount of overdrafts paid on your order, will leave $6161.75, subject to your check; also, the protested note endorsed J. M. Walker, subject to your order, in all $21,161.75.'

"This letter was the first notice received by Collins that the proceeds of the Scott acceptances had not been passed to his individual credit, as he had directed.  He returned at once to Philadelphia on receipt of it, and repudiated the application of the proceeds, and demanded that they should be transferred to his credit, as directed by him.  He testifies that Mr. Jamison acknowledged that the appropriation was without right, and promised to correct it on his books.  This promise, however, is denied by Mr. Jamison, and I do not deem it necessary to decide upon the accuracy of their respective recollections in this matter.  The rights of the parties were fixed by their acts, prior to this time, and it is sufficient to find that Collins never at any time acquiesced in the appropriation to the credit of Jamison as treasurer, nor did Jamison & Co. at any time, in fact, recede from their act by any change upon their books.

"9. The cause of action in the first suit—Jamison v. Collins, No. 46—is an overdraft by Collins upon his account with Jamison & Co., as bankers, to the amount of $7037.08.  The cause of action in the other case—Collins v. Jamison et al, No. 1229—is a balance of $17,351.81, remaining to plaintiff's credit in defendants' hands as bankers.

"The decision of both cases turns on the act of Jamison & Co., in placing the proceeds of the Scott acceptances—$24,388.89—to

the credit of B. K. Jamison, treasurer, instead of to the credit of Philip Collins. If Jamison & Co. had the right to appropriate the money, as they did, judgment must be entered for them in their suit for $8771.79, and if they had not such right, then judgment must be entered for Collins in his suit for $22,036.55.

"From the foregoing facts, I make the following conclusions :—

"I. [That the title to the three acceptances having passed on August 1st 1871, to Collins, by delivery to him as his property, to be appropriated in his discretion as superintendent to the purposes of the Central Improvement Company, no subsequent act of the treasurer of the company, B. K. Jamison, could affect Collins's title without his consent. The law of appropriation of payments, argued with great force by the counsel for Jamison & Co., is not relevant to the facts established. They present an ordinary case of the transfer of title and possession of personal property, thereby conferring an ownership which cannot be changed without the act of the owner.]

"II. [That no subsequent act of Collins worked any change in his title to the acceptances or the proceeds of their discount. He dealt with Jamison & Co. as his agents merely, just as he might, if he had chosen, have gone to and dealt with any other bankers. He was not their debtor in any way when the acceptances were delivered to them, except for the overdraft, by reason of his check for $5000, drawn on the same day, and that was drawn by him and paid by them, on the basis that the acceptances were his, and the money raised by their discount was virtually already to the credit of his individual account. Even if he was their debtor, it was upon this individual account, and his delivery of the acceptances to them, with positive instructions to place the proceeds to his credit, was an appropriation which it was his right to make, which he did make by that act, and which they conclusively assented to by receiving the acceptances without notice to him of any contrary claim or intention.

"III. [That the whole conduct of Jamison & Co. shows that they did not themselves regard the acceptances as the property of the Improvement Company or of B. K. Jamison, treasurer, even as late as August 16th—the day before the note with Walker's endorsement fell due—when they sent the acceptances the second time to the Allegheny National Bank, with the guarantee of Collins;] nor did they think of claiming any such title until after that note (called the Walker note for distinction) had fallen due and been protested for several days. Even after the money was received from the discount, they kept it four days before they made up their minds to claim that it did not belong to Collins, and in announcing to Collins the appropriation of it to the payment of the Walker note, the difficulty of fitting an after-thought into the chain of cir-

cumstances led Mr. Jamison into the unconscious use of inaccurate language.   In his letter of August 22d to Collins, he says:—

"' After deducting the amount of overdrafts paid on your order, will leave $6161.75, *subject to your check ;* also the protested note endorsed J. M. Walker, *subject to your order.*'

"Now, the proceeds of the acceptances had been passed to the credit of B. K. Jamison, treasurer, and the account of Collins, as it then stood, was overdrawn by $2000.   The balance of $6161.75, referred to in the letter, was not subject to Collins's *check*, though it might be to his *draft* on B. K. Jamison, treasurer.   The inaccurate use of such familiar words by a banker shows that Mr. Jamison's mind was even then haunted by a sense that all the proceeds of the discount belonged to Collins, and ought to be subject to his check.

"IV. That no legal liability of Collins on the so-called Walker note has been shown, and, therefore, no right to pay it out of funds belonging to him.   But even if such liability existed, the proper mode of proceeding by Jamison & Co., the holders, was to put the funds to the credit of Collins, for whom they had discounted it, and pay it in his name, so as to preserve his right against the endorser.   By their act in paying as with the money of the makers— the Central Improvement Company—they have primâ facie discharged Walker, the endorser, and thereby deprived Collins, a subsequent holder, of his security.

"V. [That, for the foregoing reasons, the act of Jamison & Co., in putting the proceeds of the discount of the Scott acceptances to the credit of B. K. Jamison, treasurer, was in violation of the orders of Collins to them, as his agents, in derogation of his title and his rights, and, as against him, wholly void.]

"In the case of Jamison *et al. v.* Collins, therefore, there must be judgment for defendant; and in the case of Collins *v.* Jamison *et al.*, judgment for plaintiff for $22,036.55."

Judgments were entered accordingly.

To these findings and conclusions a number of exceptions were filed by Jamison & Co., which the court dismissed.   They then took this writ, and specially assigned for error the findings and conclusions embraced in brackets in the foregoing report of the learned judge below.

*George Bull* and *George W. Biddle*, for plaintiffs in error.— The opinion of the court below, and the judgments founded thereon, rest entirely upon the finding of fact embraced in the first assignment of error.   If this finding of fact is erroneous the premises from which the court deduce their conclusions are equally so. We contend that it is the duty of this court to review this finding, because there was no evidence whatever of any such fact.   It has been held that where the judge in the court below has left a fact to

the jury, of which there was no evidence, it will be ground for a reversal of the judgment in this court on writ of error: Werkheiser *v.* Werkheiser, 6 W. & S. 188; Wilson *v.* Davis, 5 Id. 521; Evans *v.* Mengel, 1 Barr 82.

If there was evidence of the facts found by the court below, we would still contend that the findings are subject to review in this court.

Mr. Collins, according to his own testimony, merely made himself personally responsible for debts of the company, and his only claim is that, by reason of this responsibility, he was entitled to direct the appropriation of the proceeds of these acceptances.

Suppose his claim was correct, he had no legal right to take funds raised for the use of the company and appropriate them according to his own will, without passing them through the treasury. The treasurer of a private corporation is the legal custodian of the company's funds, and responsible for their disbursement: Turnpike Co. *v.* Watson, 1 Rawle 330; Ins. Co. *v.* Wetmore, 17 Ohio 330.

Jamison & Co. had an account with the Central Improvement Company, kept in the name of B. K. Jamison, treasurer. When the treasurer deposited the proceeds of the three acceptances to the credit of that account they had the right, as a banking firm, to defalk their claim on the $15,000 note of the company against this balance. The funds came lawfully to their hands, and the act of charging up the note was only the ordinary practice of every bank or banker in a similar case.

It is urged that the plaintiffs in error did not make the appropriation in time. It appears that for three or four days after the funds were paid into the house of B. K. Jamison & Co., they did not pass fully into their accounts, but remained as a cash item in a memorandum account called the " Cash Settlement Book." It is undoubtedly the rule that where the creditor holds more than one claim against the debtor, the latter may direct to which claim the appropriation shall be made. But if the debtor makes no such direction the creditor may make the appropriation: Logan *v.* Mason, 6 W. & S. 9; Mayor of Alexandria *v.* Patten, 4 Cranch 317; Mills *v.* Fowkes, 5 Bing. N. C. 455; Williams *v.* Griffith, 5 M. & W. 300.

In this case, however, there was but one demand to which the defalcation could apply, to wit: the note of $15,000, and it made no difference when the claim was set up, because a failure to make it at any particular time placed the debtor in no worse position.

*C. W. McKeehan* and *A. K. McClure*, for defendant in error.— The findings of facts by the court below are conclusive as to the facts established by evidence unexcepted to on the trial.

The Act of Assembly provides that " the decision of the court shall be in writing—stating separately and distinctly the facts found,

[Jamison v. Collins.]

the answers to any points submitted in writing by counsel, and the conclusions of law."

The judge is to report the facts found (*a*) as a ground for argument for a new trial; (*b*) to enable the Supreme Court upon a writ of error to determine whether or not there be error in the conclusions of law as applied to the facts found, and (*c*) also, whether or not facts were found upon evidence to the admission of which counsel objected on the trial and excepted to the ruling of the court.

It was never contemplated that the Supreme Court should re-try the case upon its merits.

This rule seems to be adopted uniformly in other states where this mode of trial is used: Henderson v. Barbee, 6 Blackford 26; Brant v. Robertson, 16 Mo. 129; North v. Bloss, 30 N. Y. 374.

The draft for the proceeds of the discount of the acceptances never came into the hands of B. K. Jamison, treasurer. Jamison & Co. received it as the bankers and agents of Collins, and as bankers the law holds them to the highest measure of fidelity in caring for his interests, and in obeying his instructions

The draft was deposited for a special purpose, and the bank could not refuse to apply it to the object for which it was deposited, on the ground that a debt was due them from the depositors: U. S. Bank v. Macalester, 9 Barr 475.

The judgment of the Supreme Court was entered, February 5th 1877,

PER CURIAM.—The governing question is the same in each of these cases, to wit, the right ownership of three drafts accepted by Thomas A. Scott, amounting to $25,000. The actions are between Collins and B. K. Jamison & Co. as bankers, and not between Collins and the Central Improvement Co., or B. K. Jamison, its treasurer. The right of the Improvement Co. to call Collins to an account for the funds raised upon these drafts is therefore not in issue, but it is a question whether Jamison & Co., bankers, who came to the possession of the proceeds for and on account of Collins, can through the act of Jamison, treasurer, divert these proceeds into a different channel, in order to pay themselves a debt ($15,000) for which Collins was not responsible to them. For these reasons the fact that the Improvement Co. raised the funds for their own benefit is aside from the present inquiry. Now the judge below has found, and so far as we can determine justifiably, the fact that Collins, as the superintendent, was intrusted with and had the lawful possession of the drafts, as the means of obtaining money, which was to go into his own hands for expenditure. He gave them to Jamison & Co., as bankers, for his own account and credit. The money was in fact raised through his means, and the check which represented the proceeds, was payable to himself, and went into the

[Jamison *v*. Collins.]

hands of Jamison & Co., bankers, as his agents in the transaction of the negotiation. It is just here where the interposition of B. K. Jamison, treasurer, became improper. He had no right to divert the proceeds of the check in the hands of Jamison & Co., bankers, the agents of Collins, from his account with them; and place them to his own credit as treasurer of the Improvement Co., and then debit that account with the $15,000 note, which was no debt of Collins. The effect of this transaction was to take the proceeds of the drafts on Scott out of the very hands to which the Improvement Co. had entrusted them, and thus to disable Collins as their super-intendent and proper agent, from disbursing them for the benefit of the company. The confusion of names as to the capacity of Jamison makes it a little difficult to state the transaction clearly, but if these drafts had been left with Drexel & Co. as bankers, we should perceive at once that Jamison as treasurer could not have intervened to change the destination of the proceeds.

This is a writ of error under the reference law of 22d April 1874, Purdon 1939. The first section gives a writ of error or an appeal, as in other cases at law or in equity; that is to say, *redendo singula singulis*. The third section provides that every such case taken to the Supreme Court upon writ of error shall be heard and determined therein as writs of error are therein heard and deter-mined; and the like provision as to cases of appeal in equity proceedings. It is clear, therefore, that in this writ of error we can hear and determine only questions of law arising upon bills of exception to the rulings of the judge relating to the evidence or to the law of the case. We cannot go behind his findings of fact, except where, in a common-law trial before a jury, the assignment of error is such as can be heard and determined by us. The writ of error brings up no question as upon a motion for a new trial. The law provides for exceptions to the findings of fact within thirty days, to be heard and determined by the judge, subject to review by writ of error or appeal.

The judgment in each case is affirmed.