┌─────────┐
│ 193  67 │
│ 193  89 │
└─────────┘

The Merchants' and Manufacturers' National Bank of Pittsburg, Appellant, *v.* Howard R. Kern, who was sued with William A. Baeder and Louis C. Haughey, copartners, now or late trading as the William A. Baeder Glue Company, defendants. William H. Kern (now Hood Gilpin, Esq., Executor of the Will of William H. Kern, deceased), Garnishee.

*Arbitration—Review of referee's findings of facts—Acts of May 14, 1874, and May 4, 1889.*

Under the act of May 4, 1889, amending the act of May 14, 1874, the court of common pleas has full power to review the report of the referee both as to questions of fact and questions of law, and may confirm, alter, amend or reverse the report, or send it back for further proceedings before the referee.

Where the report of a referee is reversed by the court of common pleas the fact that the decision of the court corresponds with the verdict of the jury in a trial in which the same question was involved as that raised before the referee should be given weight.

Argued March 30, 1899. Appeal, No. 81, Jan. T., 1898, by plaintiff, from judgment of C. P. No. 4, Phila. Co., September Term, 1898, No. 1015, sustaining exceptions to referee's report. Before STERRETT, C. J., GREEN, McCOLLUM, DEAN and FELL, JJ. Affirmed.

Exceptions to report of referee.

On May 6, 1890, the Merchants' and Manufacturers' National Bank of Pittsburg recovered a judgment against Howard R. Kern and the William A. Baeder Glue Company for $7,213.23. On February 12, 1893, it issued an attachment in execution on this judgment against William H. Kern as garnishee. On April 8, 1893, William H. Kern died, and Hood Gilpin, Esq., his executor, was substituted as garnishee in his stead. The plea was nulla bona.

On December 19, 1895, an agreement was filed referring all matters in controversy to William Wynne Wister, Jr., Esq., as referee under the act of June 16, 1836.

The referee reported as follows:

The William A. Baeder Glue Company was a copartnership consisting of William A. Baeder, Howard R. Kern and Louis C. Haughey. The company was organized in 1888; prior thereto William A. Baeder and Howard R. Kern had been partners together in the glue business. The company was engaged in the manufacture of glue in Springdale, Allegheny county, a town about seventeen miles from Pittsburg, from which place the glue was shipped to New York for sale, Louis C. Haughey attending to the manufacturing part of the business, and William A. Baeder and Howard R. Kern to the financial and sales department. The firm failed in business about March 10, 1890, largely indebted to a number of creditors, among others, the present plaintiff. The garnishee, William H. Kern, was the father of Howard R. Kern, one of the members of the insolvent firm, and at the time of the failure was likewise a creditor, the company being indebted to him for large sums of money loaned and advanced to it at various times.

Shortly before the failure on March 3, 1890, a judgment was entered against the firm in Pittsburg on a judgment note for $26,722.87, given by the partners of the firm on January 10, 1890, to William H. Kern for the amount it was admitted they owed him. At this time very little of the indebtedness was actually due, the promissory notes representing it not having matured; but it was agreed by the partners that, for the purpose of facilitating William H. Kern in obtaining a judgment as security for his advances, all existing indebtedness should be considered and treated as if due.

Besides the sums advanced to the William A. Baeder Glue Company, Howard R. Kern was largely indebted to his father on his individual account for personal loans made to himself, and for which he confessed judgments in Philadelphia and Allegheny counties.

On March 12, 1890, nine days after the judgment for $26,722.87 was entered, William H. Kern obtained a judgment in the state of New York against the glue company for $38,587. This judgment was entered through default of Howard R. Kern, as a member of the firm, notice of the suit having been given to William A. Baeder and Howard R. Kern, who appeared by counsel, which appearance was afterward withdrawn. The discrepancy between the amount of the judgment for $26,722.86

given by the partners, and the one for $38,587, obtained in New York, being nearly $12,000, arose from William H. Kern including in the latter amounts which he had advanced to his son Howard on his private account, previous to the formation of the partnership in 1888, and which it is alleged the partners afterward agreed should be considered a partnership debt. The principal testimony in support of this allegation was that of Howard R. Kern himself, which was clearly in conflict with the act of the partners in giving the judgment note of January 10, 1890, for all the indebtedness of the firm then admitted to be owing by them. No loans or advances were shown to have been made by W. H. Kern between the date of the first judgment and the entry of the last one.

Prior to or about the time of the failure William H. Kern received from the glue company a number of storage or warehouse receipts for glue belonging to the firm, and stored in New York, amounting in the aggregate to 2,209 barrels, containing 433,257 pounds of glue. These receipts were transferred to him (by whom does not clearly appear) for the purpose of protecting his claim, and in order to give him a preference over the other creditors. No transfer, however, was made of the glue on the books of the glue company, nor were the warehouse receipts transferred into this name. On March 26 and 27, 1890, William H. Kern sold the entire lot of glue comprised in the warehouse receipts to James E. Salter for the sum of $24,000, and in a few days thereafter received a due bill for that amount. Mr. Salter had never been in the glue business, and admitted that he was ignorant alike of the quality or value of glue, did not see any samples of the glue in question, and virtually stated that he accepted the glue in order to accommodate W. H. Kern, who seemed to be worried about it. Mr. Kern himself had taken no steps to learn the value or quality of the glue, nor the best method to dispose of it. His information on the subject was derived from Howard R. Kern, who said it was worth about $24,000, though an offer of between $40,000 and $45,000 had been refused for it. Immediately after the purchase, Salter said to Mr. W. H. Kern, "Now, I have gotten this glue, how in the world shall I get rid of it," to which Mr. Kern replied, "You had better see Howard, he can tell you." Without making any further effort to dispose of it, Salter saw Howard R.

Kern, and agreed that he should take charge of it and sell it. It was finally sold through the agency of the Acme Glue Company, a corporation chartered in New Jersey about that time, the stock of which was held, with the exception of a few shares, by members of Howard R. Kern's family, and of which he was the business manager. The price Mr. Salter stated that he received for the glue was $32,000, which was about seven and a half cents a pound. He allowed Howard $3,200 as commissions, and retained $5,000 for himself. The payment was made in checks and notes of the Acme Glue Company, none of which, however, was offered in evidence, nor was it shown what price was paid for it. The glue consisted of different grades and quality, the greater portion being of high grade, the market prices of which ranged from nine to thirteen and a half cents per pound, if sold in moderate quantities, and not under pressure. The average cost of production of the better grades was about ten cents per pound.

In addition to the glue, William H. Kern received through Howard, as collateral security for his claim, $14,996 of business paper, indorsed by the Indianapolis Glue Company to the order of the William A. Baeder Glue Company, from which he realized the sum of $4,000 by a compromise made with the makers of the notes. He also received from the glue company $11,956.20 of commercial paper, on which he collected $9,554.33. Over and above the sums obtained from these collaterals he received in cash $2,090.20 from the sheriff of New York under an execution on his judgment obtained in that state, and $3,850 paid to his attorney, Mr. Hood Gilpin, in settlement of a prosecution brought against Louis C. Haughey as a partner in the glue company by Howard R. Kern for the alleged embezzlement of the funds of the partnership.

A few days before the failure, W. H. Kern received from New York two checks of the William A. Baeder Glue Company, amounting to $4,622. When this remittance was made, it was clearly understood that it was to be considered and treated as a special deposit of the firm, and was to be paid or returned on orders drawn by the firm as the exigencies of the business might require; the deposit was made to avoid the risk of having it attached in the hands of the New York banks. The full amount was afterwards repaid as agreed, on orders of

the company, signed by Howard R. Kern, but for what purpose did not clearly appear, though some of it was undoubtedly to pay for storage of glue owned by the firm.

The defendant, W. H. Kern, made no entries of these various financial transactions ; in fact, he kept no books, and stated that the loose memoranda that he sometimes made were invariably destroyed whenever he received an obligation for them, or, in his words, when the transaction was completed.

Some time in the latter part of 1889, through Isaac R. Bloodgood, Howard R. Kern became interested in 1,125 shares of stock of the American Coal Company, which had been pledged by Elizabeth Bloodgood, the owner, to secure certain loans made to her. These loans amounted to over $10,000, and the stock at its then market value was scarcely sufficient to cover their amount. By an agreement made in February, 1890, with the different parties interested in this stock, it was agreed that Howard R. Kern should pay off the loans, dispose of the stock, and, after paying Mrs. Bloodgood twenty-five per cent of the surplus, retain whatever remained for himself, the dividends in the mean time to be paid to Howard R. Kern, who at the time reduced the amount of the loan to the sum of $10,000.

When the W. A. Baeder Glue Company failed, Howard R. Kern, who was largely indebted to his father on his individual account, besides his indebtedness as a member of the firm, transferred and assigned all his interest in this stock of the American Coal Company to William H. Kern, the latter at the same time canceling a note of his son's for $1,000, which was overdue and unpaid. The assignment was made in the early part of March, 1890, the pledgees duly notified and a payment of $1,752 made on account of the money advanced. In July, 1890, Walter R. Kern, representing his father, W. H. Kern, paid the balance of $7,500 due on the stock, and had the certificates transferred into his name, indorsed them in blank and handed them to his father. The stock, by direction of W. H. Kern, was subsequently transferred to various persons, including, among others, Mabel E. Kern (a daughter of Howard), none of whom paid any consideration therefor. It was eventually sold at a price greatly in excess of what it would have realized at the time the loans were paid off, the proceeds, amounting to some $22,419, being paid to Mabel E. Kern, and the dividends while it was

unsold being collected by her father on orders signed by the parties in whose name the stock was registered.

The W. A. Baeder Glue Company never had any claim to nor possessed any interest in this stock of the American Coal Company.

The amount of the plaintiff's claim was proved to be $7,213.23, with interest from May 6, 1890.

## OPINION.

Two questions arise on the foregoing facts :

1. Whether the garnishee, William H. Kern, is liable, and if so, to what extent, for the property of the insolvent firm that came under his control or into his possession. The plaintiff alleges that there was a concerted scheme on the part of Howard R. Kern to obtain control of the assets of the William A. Baeder Glue Company for his own benefit, in which he was aided and abetted by his father, the present garnishee, and as this was in fraud of the rights of creditors, the defendant must not only account for the full value of the assets traced into his possession, but is postponed in the collection of his own claim until the former are fully paid. On the other hand, defendant contends that he was a preferred creditor of the insolvent firm, and that the assets he received were collaterals, pledged for the payment of a bona fide indebtedness, which they were insufficient to satisfy in full, and having recuperated himself as far as possible, his responsibility ceases. But, however that may be, it is practically unimportant in the present controversy, because the plaintiff, having previously tried and determined the same question in the suit of the Merchants' and Manufacturers' National Bank of Pittsburg against the Baeder Glue Company, reported in 164 Pa. 1, is estopped by that decision from further litigation. This raises an important question, entirely apart from the real merits of the suit, for if the defendant is correct, the present action must fail, even though there may be ample funds to pay the debt.

While there is no doubt as to the rule that a judgment by a court of concurrent jurisdiction directly upon a point is conclusive between the same parties on the same matter directly in question in another court (The Duchess of Kingston's Case, 11 Harg. St. T. 261 ; Lentz v. Wallace, 17 Pa. 412), there is

always more or less difficulty in its application.   It is an essential part of the above rule, however, that the judgment is not evidence of any matter that came collaterally in question or was incidentally cognizable, nor of any matter to be inferred by argument therefrom: King v. Chase, 15 N. H. 9; Hibshman v. Dulleban, 4 Watts, 191.   In order to make the verdict of a jury and judgment thereon available as an estoppel, it must be clearly shown not only that the same matter was directly in issue, but that it was actually decided, and where the finding of the jury may have been based on one or more points it will not be an estoppel as to any: Wood v. Jackson, 18 Wend. 107; Aiken v. Peck, 22 Vt. 255.   The true inquiry, therefore, is, what was simply matter of evidence, and what the real matter at issue.

In the trial of the plaintiff's first attachment the matter in issue was whether the garnishee has assets in his hands belonging to the William A. Baeder Glue Company, and the jury found that he had.   So far the verdict and the judgment thereon may be considered conclusive.   Then as evidence of the sufficiency of those assets to cover its debt, the plaintiff submitted various items for which it claimed the garnishee was responsible.   The jury found generally that there was $15,000 in the garnishee's hands, the plaintiff's claim being $12,000, but on which of the several items it was due there is not a particle of evidence to show.   If, under these circumstances, the bank, on an entirely different contract of the glue company, is precluded from proving that there are further assets in the hands of the garnishee, it would seem an application of the rule beyond what is sanctioned by authority.

In Lentz v. Wallace, 17 Pa. 412, the record of a judgment against a husband for necessaries furnished to his wife, in consequence of his having turned her out of doors, was held to be no evidence of a wrongful ejection in a suit between the same parties for additional necessaries; on the ground that the question of eviction was only incidentally before the court, and in Lewis's and Nelson's Appeal, 67 Pa. 153, where plaintiffs filed a bill for an account for moneys due on a contract for furnishing defendants with lumber, the latter in their answer as a bar to this bill set up the record of a replevin suit in which they had recovered judgment against the plaintiff upon showing by

the accounts submitted to the jury that the plaintiff was indebted to them.   But SHARSWOOD, J., in his opinion holding that the replevin was no bar, says : " In the former suit it was required that the jury should go into the accounts so far, and so far only, as was necessary to settle that question."   The " direct object of the suit was not an account, and the judgment was not conclusive for or against either party."   In Campbell v. Consalus, 25 N. Y. 613, cited and approved by SHARSWOOD, J., there had been a proceeding by a mortgagor to compel satisfaction, and upon the report of referees that there was still a balance due on it, the bill was dismissed.   Upon a subsequent bill by mortgage to foreclose, it was contended that the decree in the first case estopped the defendant from setting up that the mortgage was then paid, but the court held the contrary unanimously.   In consequence, " they say of the nature of the transaction it was unnecessary to take and state an account in order to determine how much, if any, was due, but the evidence and inquiry as to the amount due was merely incidental or collateral to the direct issue, whether anything was due."

These authorities state with great distinctness the difference existing between such matters as are deemed merely incidental or collateral, and those which pertain to the real issue, and when considered by their light it can scarcely be doubted that the amount found by the jury in the first attachment was merely incidental to the real issue, and consequently no bar to the present suit.   As was said in Lewis's Appeal and Campbell v. Consalus, "It was only necessary for the jury to examine the accounts, as collateral to the principal issue."   So in Bank v. The Baeder Co., they were merely required to consider the items so far as to determine if there were enough funds in the hands of the garnishee to satisfy the plaintiff's debt in that suit.   This was the scope and sole purpose of the evidence submitted ; and the fact being established, it was beyond their function to determine the full extent of the garnishee's liability. The plaintiff is therefore at liberty to show that such liability was not exhausted and that there are still funds in the defendant's hands applicable to his debt.

The next question is as to the right of the garnishee to retain the amount of his debt out of such assets as are in his possession, which plaintiff contends has been forfeited through fraud.

There is no question that the law prohibits a creditor from acquiring his debtor's property by means of a fraudulent judgment, and that it will not permit him to retain even a bona fide indebtedness out of property conveyed by an instrument made with the fraudulent intent of delaying others. But this results from fraud which exists at the inception of the title, and not from acts committed thereafter, as is clearly shown by an examination of the authorities. In Bunn, Raignel & Co. v. Ahl, 29 Pa. 387, the plaintiff was endeavoring to obtain the property of his insolvent debtor by means of a judgment fraudulently gotten for the express purpose of hindering other creditors, and the Court says: "A judgment obtained to defraud creditors cannot be purified even by abandoning the fraudulent purpose and using it for an honest one. A judgment so obtained must not be used even to secure an unforbidden preference." In Kisterbock's Appeal, 51 Pa. 483, the plaintiff, a director in an insolvent corporation, sought to recover out of the assets a loan which, as director, he had made for the very purpose of enabling the corporation to declare a dividend, knowing at the time that it was hopelessly insolvent. And Agnew, J., says: "This is not a mere set-off or counterclaim. The plaintiff assisted by fraud to reduce the association to insolvency, and he now seeks to put in his hand and withdraw from the assets the very money he gave to carry out the fraud." In Baldwin v. Short, 125 N. Y. 553, the conveyance was made to the debtor's daughter for the sole purpose of delaying the creditors of the grantor, and it was so admitted both by the grantor and grantee. In Boyd v. Dunlap, 1 Johns. Ch. 478, the grantor, an insolvent debtor, confessedly conveyed to his son for a wholly inadequate consideration, which was directly in fraud of creditors. In decreeing a reconveyance, however, the chancellor allowed the son to retain the amount he had actually expended. The same principle is recognized in Covanhovan v. Hart, 21 Pa. 495.

The present case presents a different state of facts, however. The defendant is neither seeking to obtain control of property by means of a fraudulent judgment, nor is he in possession under a conveyance shown to have been made in fraud of creditors. As garnishee in an attachment, he claims the right to retain the amount of his debts out of assets that, so far as ap-

pears, were legitimately transferred to him as security for a just indebtedness. There is no evidence that impugns the validity of this transfer at the time it was made. The fraud which it is claimed works a forfeiture was in the procurement of a judgment for a larger amount than was actually due, and an alleged conspiracy with his son to control the property that came into his possession so as to exclude the creditors from any benefit therein. In the absence of evidence of a prior fraudulent intent, it is endeavored to infer it from subsequent acts. It may safely be asserted, however, that no act of the defendant after his acquisition of the property could prejudice his claim, unless it is clearly demonstrated that such act was the necessary sequence of the previous intent, and mere suspicions, no matter how strong, are inadequate for this purpose : Boyd v. Dunlap, 1 Johns. Ch. 478. The existence of a fraudulent intent must be shown at 'the time the property was received, and not inferred from subsequent conduct. There was an admitted debt in this case and a legitimate transfer of securities, and, as was said in Werner v. Zierfuss, 162 Pa. 360, "But little room is left to attribute fraudulent motives when a debt is actually due nearly equal in amount to the value of the property received."

However questionable some of the defendant's proceedings, the testimony fails to disclose any such fraudulent purpose in acquiring the collaterals as warrants the exclusion of his claim. While it cannot be denied that the testimony unfolds an almost unparalleled course of fraud and deceit on the part of Howard R. Kern, it unquestionably fails to establish a conspiracy between the latter and W. H. Kern. It was the son who originated every scheme of a suspicious nature, and by him they were consummated or abandoned, and when impartially considered, apart from the natural tendency to attribute a concert of action between those so closely related, the testimony indicates that the defendant was far more of a tool in the hands of his son than an accomplice with him in a preconcerted scheme of fraud. Nor can it be said that the judgment, although for a larger amount than was warranted by the proof, points to any such fraudulent intent as vitiates the defendant's claim. The excess above what is admitted to be due arose from claiming as part of the firm's indebtedness certain loans originally made to

Howard R. Kern on his individual account, but which defendant asserted was afterwards assumed by the partners. That the partners had a perfect legal right to do this cannot be questioned, nor that it would be binding on the creditors. The defendant, however, failed to establish the fact; the testimony of his son, on which he relied, was not only unreliable in itself, but was in conflict with the act of the partners in giving a judgment note on January 9, 1890, for the full amount they admitted as due, and this conflict being unexplained the proof failed. But a simple failure to prove the amount claimed cannot be construed such a fraud as would postpone the defendant's preference. Whether the defendant was correct in his assertion or not it is impossible to determine; all that can be said is, there was an insufficiency of proof to sustain it. In the opinion of the referee no such fraud has been shown as would warrant the rejection of defendant's claim, and he is, therefore, entitled to retain the sum of $26,722.87 out of the assets in his possession.

But notwithstanding the absence of such fraud as entails a forfeiture of his debt, it by no means follows that the defendant is exempt from liability for his conduct in the disposal of the property, nor from accounting for all that he obtained in excess of his claim. Having received the collateral, it was his duty to see that it was prudently managed and judiciously applied. That he failed in the performance of these duties is apparent. The least that can be said of his conduct is that it evidenced an utter indifference to the claims of other creditors, and a culpable neglect of their interests. His sale of the glue to one whom he knew was alike ignorant of its nature and worth, for a price greatly below its value, cannot be too strongly condemned, and while not necessarily fraudulent, was certainly a breach of his duty as a quasi trustee. The negligence shown by intrusting the property to one whose honesty he had sufficient reason to doubt, together with the want of care displayed in its disposal, unquestionably renders him responsible to those who have suffered through his neglect and indifference. This constitutes the real nature of the defendant's liability, a liability to account for losses resulting from his gross mismanagement, although not amounting to actual fraud.

It was strongly urged on behalf of the garnishee that, having been paid his claim, and having surrendered the property, it

matters not to whom, he is no longer accountable to those whose attachments issued after the date of surrender. This is clearly an assumption of the very point in controversy, for if the garnishee possessed assets which he improperly surrendered, it makes no difference when the attachments issued, he is still accountable for the value of those assets, and the proper mode of testing the question is by the present suit: Heath.v. Page, 63 Pa. 108. The nature of the defendant's liability being defined, it remains to determine the extent of that liability. In other words, what has been shown to be the amount of property that came into his possession for which he is accountable to the plaintiff as creditor of the insolvent firm.

First, with reference to the glue. It has already been said that it was sold at a price far below its value, and although the defendant was not liable for the highest market price, it was clearly his duty to use diligent efforts to obtain a reasonable and fair one. He was bound to the exercise of common business prudence and good faith, and the sale to Salter was neither, and furnishes no criterion as to its real worth. In considering the question as to the amount the defendant should be charged for the deliberate sacrifice of the glue, due regard must be paid to its quality and condition, on which so much of its value depends, and which serves to explain the otherwise seeming discrepancy in the testimony. Although it was shown that a certain lot of glue pledged by the firm to another bank was sold about this time for seven and a half cents a pound, there was no proof as to its quality or fineness. But it was clearly established that this particular glue was of a very high grade and quality, though differing in grade, by far the largest portion being of superior quality, and that the market prices therefor, according to competent witnesses, ranged from nine cents for the lowest to thirteen and a half cents per pound for the higher, amounting in the aggregate to over $50,000 for the lot. It was also shown that an offer had been made and refused for this same glue in the neighborhood of from $40,000 to $45,000.

No ground is assigned for questioning the accuracy of these prices, and if due allowance is made for a possible abatement, in consequence of the sale of so large a quantity at one time, there is no reason to doubt that the glue could readily have

been sold at prices that would have averaged ten cents a pound for the whole, provided the defendant had exercised the ordinary care and attention which his duty required. At this rate the defendant's liability would amount to $43,325.70; deducting therefrom his claim of $26,722.87 leaves $17,602.83, as the sum for which he is responsible. On this sum he is to be charged with interest from March 27, 1890, the date of conversion.

Since it cannot be contended that the garnishee has shown either a readiness or willingness to pay, he is clearly within the ruling laid down in Jones v. Manufacturers' Nat. Bank, 99 Pa. 319, and Rushton v. Rowe, 64 Pa. 63. The defendant's debt being fully satisfied, he is, of course, chargeable with the $2,090.20 in cash received from the sheriff of New York on March 29, 1890, and likewise the sum of $3,850, paid July 10, 1891, in settlement of the criminal prosecution against Louis C. Haughey, with interest on each from the time they were received.

No question being raised as to the compromise with the makers of the notes obtained from the Indianapolis Glue Company having been improvidently made, he is only chargeable with the amount received, $4,000, and interest thereon, from the date of compromise, June 26, 1891.

He admits the receipt of $9,576.33 on account of commercial paper assigned to him by the W. A. Baeder Glue Company, for which he must also account, together with interest from the times the respective payments were made, as set forth in plaintiff's statement, which being undisputed, are taken as correct.

In regard to the stock of the American Coal Company, a vast amount of testimony was submitted for the purpose of showing that after W. H. Kern had acquired title through Howard R. Kern he transferred it to various friends and members of the latter's family, and acquiesced in the payment of the dividends to his son. It is difficult, however, to see what effect this could have on the defendant's status. Having once obtained the legal title, no disposition that he afterwards made of the stock or its proceeds could by any possibility invalidate it. That Howard was indebted to defendant at the time of transfer to an extent far greater than the stock was capable of liquidating is not denied, in addition to which the defendant

surrendered a note for $1,000, which was overdue and unpaid. This vested in W. H. Kern a perfectly valid title to the stock, with the absolute right to dispose of it as he saw fit, and its subsequent rise in value in nowise impaired this right. It is also admitted that the W. A. Baeder Glue Company never had the slightest interest in or claim to this stock, so that the plaintiffs as creditors of the firm could lay no claim thereto, and as creditors of Howard R. Kern they must necessarily be postponed to his individual creditors, whom the stock at its highest value was unable to satisfy: Black's Appeal, 44 Pa. 503. Under no circumstances, therefore, can the defendant be charged with this stock or its value. There is no similarity between the case of the stock and that of the glue. The former was the separate property of a member of the firm, and defendant's title was absolute and carried with it all the rights of absolute ownership. In the case of the glue, his right was qualified to the extent that, being an asset of the insolvent firm, he was in the position of a trustee for the creditors, and was bound to see that it realized a fair price and that the interests of others were not wantonly sacrificed.

The remaining item for which the plaintiff claims the defendant is accountable is the sum of $4,622, which was remitted to him by the firm on March 6, 1890, just before the failure. This was a special deposit made upon the distinct understanding that it should be held by defendant and paid on orders drawn from time to time as the necessities of the business required. It was made in order to avoid the possibility of its being attached in the hands of the new banks, and there is no evidence to show that it was applied otherwise than as stipulated. It is not even suggested that the defendant received the least benefit, and the creditors suffered no detriment beyond what always ensues when one claimant is preferred over others. No obligations rested on defendant to violate the terms of his agreement, and no reason has been shown for holding him liable for this amount.

This disposes of all the questions submitted for consideration, and the referee finds that the amount of the plaintiff's claim is $7,213.23, with interest from May 6, 1890, and that there is in the hands of the garnishee the various amounts hereinbefore stated, with interest thereon from the dates specified, from which is to be deducted the amount already recovered in the suit of

the Merchants' and Manufacturers' National Bank of Pittsburg v. The Baeder Glue Company, in common pleas No. 2, March term, 1890, No. 440, and the amount payable in the attachment of the Allegheny National Bank of Pittsburg v. Baeder et al., common pleas No. 3, June term, 1890, No. 561, and submits the following judgment: amount of plaintiff's claim, $10,554.62, and that there is in the hands of the garnishee, $43,289.90.

Exceptions to the referee's report were sustained, ARNOLD, P. J., filing the following opinion:

In this case judgment was entered against Howard R. Kern on May 6, 1890, for $7,213.33. On February 12, 1893, an attachment sur judgment was issued and served on William H. Kern, garnishee. There were several other attachments served on William H. Kern prior to this attachment, and several were served on his executors after his death, which occurred on April 8, 1893. All these attachments, some of which were brought in other courts and transferred to this, were referred to William Wynne Wister, Jr., Esq., as referee, who has taken testimony and reported that there is in the hands of the garnishees $43,289.90, subject to the amount recovered by the Merchants' and Manufacturers' National Bank of Pittsburg v. The Baeder Glue Co., in common pleas No. 2, March term, 1890, No. 440, and the amount payable under the previous attachment of the Allegheny National Bank of Pittsburg v. Baeder et al., common pleas No. 3, June term, 1890, No. 561, and the Merchants' and Manufacturers' National Bank of Pittsburg v. Baeder et al., common pleas No. 3, March term, 1890, No. 655, which is the claim now before us. We have in the case of the People's National Bank of Pittsburg v. Howard R. Kern et al., common pleas No. 4, June term, 1891, No. 82, a bill in equity, decided that no preference could be obtained by a suit in equity against the estate of William H. Kern. All his creditors will have to await the settlement of his estate by the orphans' court, and the attachments will bind any dividend awarded by the orphans' court to the Baeder Glue Company and Howard R. Kern, in case William H. Kern's estate should not be able to pay all his creditors in full: Bouslough v. Bouslough, 68 Pa. 495 ; Maurer v. Kerper, 102 Pa. 444.

The main question in dispute and tried before the referee is the amount in the hands of the garnishees, which, as before said, the referee has fixed at $43,289.90.  The reference originally was under the act of 1836, but by agreement of the parties it has been amended so as to make the reference under the act of 1874 and its supplements, in order that we may review the testimony and enter such finding as we deem proper upon the evidence.

The first item in dispute was the value of certain glue in the hands of William H. Kern, in pledge but belonging to the Baeder Glue Company.  The referee has charged the garnishees with the value of this glue at ten cents per pound, equal to $43,325.70.  William H. Kern, as before said, had this glue in his possession, and, being anxious to dispose of it, he transferred the warehouse receipts for the glue, ostensibly for $24,000, to James E. Salter, who is a member of the bar, now engaged in the plumbing business, and was formerly a deputy sheriff under William H. Kern.  In this matter Mr. Salter was serving Mr. William H. Kern, who was confined by sickness at the time.  Salter sold the glue through the agency of Howard R. Kern to the Acme Glue Company, a corporation in which Howard was largely interested, for $32,494.42, or at the rate of about seven and a half cents a pound, but the sale was for the benefit of William H. Kern, whose estate will be required to account for the proceeds, whether he received all the proceeds or not.  As this appears to have been an actual sale of the glue, and William H. Kern received no further returns from it, we are of opinion that he should be charged for it at the sum for which his agent, Salter, sold it to the Acme Glue Company, to wit: $32,494.42.

William H. Kern recovered a judgment for $38,902.08 against the William A. Baeder Glue Company in New York, on which he realized the sum of $2,090.20, for which he should be charged.  He also received from the compromise of a claim of the William A. Baeder Glue Company against the Indianapolis Glue Company the sum of $4,000, and from certain commercial paper received from the William A. Baeder Glue Company, $9,576.33.  A prosecution was instituted in Pittsburg against Louis C. Haughey, for some injury done to the Baeder Glue Company, of which he was a member, which

prosecution was subsequently compromised, and out of the sum paid in compromise, after deducting expenses, William H. Kern received $3,850, for which he should be charged. That he is responsible for this sum was decided in the case of the Merchants' and Manufacturers' National Bank of Pittsburg v. The William A. Baeder Glue Company, 164 Pa. 1, the testimony in that case being before the referee in this. The total amount received by William H. Kern is $52,010.95.

Out of this sum the garnishees claim to retain the amount of the judgment held by William H. Kern against the William A. Baeder Glue Company in New York for $38,902.08. William H. Kern's right to deduct some amount is not disputed, but there was a dispute as to the amount to be allowed, and the referee has reduced the amount of the judgment to $26,722.87, upon the ground that the excess, about $12,000, represents individual indebtedness of Howard R. Kern and not indebtedness of the Baeder Glue Company, but the testimony shows that that sum of $12,000 went into the business of the Baeder Glue Company and was adopted by that company as an indebtedness by it. That a firm may make itself liable for such an indebtedness is undoubtedly true, and as the referee has found that the evidence unquestionably failed to establish a conspiracy between Howard R. Kern and William H. Kern to defraud other creditors, we think the referee erred in not allowing the judgment for the full amount. There is no proof that it was confessed for the purpose of hindering and defrauding creditors, and it undoubtedly was rendered for an actual sum of money due and owing. Even if it could have been impeached for fraud, that must have been done in the court in which it was rendered; it cannot be done in a collateral proceeding: McClain's Estate, 180 Pa. 231; Thompson's Appeal, 57 Pa. 175. Taking the gross amount found to be in William H. Kern's hands, $52,010.95, and deducting from it the judgment held by William H. Kern for $38,902.08, we have a balance, which we find to be due by William H. Kern, of $13,108.87. This accords with the finding of the jury in the case of the Merchants' and Manufacturers' National Bank of Pittsburg v. The William A. Baeder Glue Company, 164 Pa. 1, in which the jury found that there was in the hands of the garnishees the sum of $15,657.18, the difference no doubt being made up of interest.

The next question is whether interest should be charged upon this amount, and, on due consideration, we are of opinion that it should be so charged. Payment of the principal was not delayed by the litigation between the plaintiff and the defendant, the Baeder Glue Company, but by the litigation between the plaintiff and the executors of Mr. Kern, and we know of no reason why the rule of law which gives interest as damages for the delay should not be applied in this case. See Rushton v. Rowe, 64 Pa. 63, and Jones v. Manufacturers' Nat. Bank, 99 Pa. 317. Interest will be allowed on the above amounts from the dates set forth by the referee in his report. As this matter involves a calculation of interest, if the parties cannot agree upon the total of principal and interest, and the amounts due on the attachments, we will refer the matter to a competent accountant to make said calculation.

As the estate of said William H. Kern has not been settled by the orphans' court, the attaching creditors of the Baeder Glue Company and Howard R. Kern must await the adjudication of that court, for if William H. Kern's estate should prove to be insolvent, his creditors will be awarded a dividend only, which will be subject to the attachments: Bouslough v. Bouslough and Maurer v. Kerper, supra. We ascertain the indebtedness and the orphans' court ascertains the dividend.

A similar finding will be entered in the other cases argued before us, to wit: Allegheny National Bank v. Kern, common pleas No. 3, June term, 1890, No. 561, now in this court, September term, 1898, No. 1017; The People's National Bank of Pittsburg v. Kern, common pleas No. 4, June term, 1891, No. 81; the two cases of the Market and Fulton National Bank of New York v. Kern, common pleas No. 3, March term, 1890, No. 306, now in this court, September term, 1898, No. 1014, and common pleas No. 3, September term, 1890, No. 314, in this court, September term, 1898, No. 1016, and Charles Townsend v. Kern, common pleas No. 4, March term, 1897, No. 758.

*Error assigned* among others was in setting aside the report of the referee.

*Henry C. Todd*, for appellant.—The findings of fact by a referee appointed under the Act of May 14, 1874, P. L. 166, are as conclusive as the verdict of a jury: Bruch v. Philadel-

phia, 181 Pa. 588; Ely v. Ry. Co., 158 Pa. 233; Merriman v. Phillipsburg Borough, 158 Pa. 78; Glase v. Phila., 169 Pa. 488.

The rule, as we understand it, laid down by the Supreme Court in the cases prior to the passage of the act of 1889, as to referee under the act of 1874, was, first, that the court of common pleas had no jurisdiction in such cases, and referees' reports could be reviewed only by the Supreme Court on writ of error or appeal; second, that even the Supreme Court could hear and determine only questions of law involving the rulings of the referee upon admissions of evidence or upon his report; his findings of fact have always been treated as conclusive as the verdict of a jury: City of Phila. v. Linnard, 97 Pa. 242; Lee v. Keys, 88 Pa. 175; Brown v. Dempsey, 95 Pa. 243; Bradlee & Co. v. Whitney, 108 Pa. 362; Southern Maryland R. R. Co. v. Moyer, 125 Pa. 506.

With the act of 1874 thus construed by the Supreme Court, the act of 1889 was passed giving to the court of common pleas the power " to confirm the report of the referee, or alter, amend or reverse it, or send it back to the referee for further proceedings before him." The supplement of 1889 simply conferred upon the court of common pleas the same authority to review the report of a referee that the Supreme Court had before the supplement passed: Ridge Ave. Ry. Co. v. Philadelphia, 181 Pa. 592; Smith v. Times Pub. Co., 178 Pa. 481; Com. v. Hulings, 129 Pa. 317; Eichman v. Hersker, 170 Pa. 402; Com. v. Westinghouse Mfg. Co., 151 Pa. 265.

*John G. Johnson,* with him *Bernard Gilpin,* for appellee.— Prior to 1889 there was no right whatever in the appellate tribunal to treat the findings of facts other than as equivalent to a verdict of a jury. There was no power to alter or amend or modify. It is also true that Bruch v. Philadelphia, 181 Pa. 588, was decided under a reference made subsequently to the act of 1889. It was a case, however, in which the findings of fact by the referee were sustainable equally well as those involved in the opinion of the court below reversing them. Suffice it to say, however, that no reference whatever was made in the opinion to the act of 1889, and this Court has not passed upon the effect of that act.

We concede that the report of the referee is entitled to great respect, and that the court below should not alter it unless satisfied, after argument, that the exceptions are well founded; but we submit with great confidence that the report of the referee is no longer to be taken as the equivalent of a verdict of a jury. At best it stands upon no higher plane than did the report of a master in equity: Smith v. Times Pub. Co., 178 Pa. 481.

OPINION BY MR. JUSTICE FELL, October 6, 1899:

The main contention of the appellant is that the court of common pleas was without power to set aside the referee's findings of fact and to substitute different findings. The reference was made in accordance with the 3d section of the act of June 16, 1836, and all matters of law were reserved for the decision of the court; but it was agreed that the referee, after reporting upon all matters of fact in controversy, should report to the court his conclusions as to the law governing the case with a recommendation as to the form of judgment proper to be entered. Subsequently the agreement for reference was amended so as to bring it under the act of May 14, 1874. The action of the court in reviewing the findings of fact and entering different findings was based on the act of May 4, 1889, which is a supplement to the act of 1874.

The award of a referee under the act of 1836 is given the same effect as a special verdict, and the only exceptions allowed to the award are, (1) that the referee misbehaved; (2) that he committed a plain mistake in matter of fact or matter of law; (3) that the award was procured by corruption or undue means. The power of the court in the correction of errors is limited to a reference back " for such further or other proceedings therein as shall be expedient."

The act of May 14, 1874, made no provision for hearing exceptions or otherwise reviewing or correcting the decision of the referee by the court of common pleas. The appeal was directly to this Court. The writ of error brought up only questions of law, and for all purposes of review the judgment entered on the report of the referee was substantially the same as the judgment of the court on a case submitted to it without a jury under the act of April 22, 1874: Jamison v. Collins, 83 Pa. 359;

City of Philadelphia v. Linnard, 97 Pa. 242; Southern Md. R. R. Co. v. Moyer, 125 Pa. 506.

The act of May 4, 1889, makes a radical change in the practice in relation to the hearing of exceptions to the report of a referee. It provides that when exceptions have been filed with the referee his report and his action on the exceptions shall be reviewed by the court of common pleas, and the court is given power to confirm, alter, amend or reverse the report, or to send it back for further proceedings before the referee. The intention to establish by this supplemental act a new mode of procedure, and to give the court of common pleas full power of review, is very clearly expressed. The only basis for even a doubt upon the subject is found in Bruch v. Philadelphia, 181 Pa. 588, and there only in the fact that the decisions construing the act of 1874 were applied to a reference made after the passage of the act of 1889. There was no intention to construe the later act, and the fact of its passage was overlooked. There was no reference to the act in the briefs presented or in the arguments made, and the case was treated by counsel as coming under the act of 1874, and was so presented to the court.

The questions of fact involved in the case present unusual difficulties. The learned referee found that there had been no fraud on the part of the garnishee, but held him liable to account for the value of merchandise which had been pledged with him as collateral security for a debt due him by the defendants, for the reason that he had negligently sold it for an inadequate price. The market value of this merchandise and the amount due the garnishee by the defendants were the main questions of fact in dispute. The referee found that the merchandise was worth $43,325.70, and that the garnishee's just claim against the defendants was $26,722.87. The court found the value of the merchandise to be $32,494.42, and that the amount due by the defendants, because of the assumption by the partnership of a debt for money loaned one of the members which had gone into the partnership business, was $38,902.08, and reduced the award accordingly.

An issue involving precisely the same questions that were raised before the referee was tried in the common pleas, and the testimony taken at that trial was used by the referee and was the basis of his findings of fact. The judgment entered

by the court, allowance being made for interest, corresponds with the verdict of the jury in that case.   We have then in an issue in which, because of the conflict of testimony and the questionable conduct of some of the parties, the truth is peculiarly difficult of ascertainment, on the one hand the findings of a most careful and competent referee, and on the other the findings of the learned judges of the court, fortified by their correspondence with a verdict of a jury.   Nothing but a clear conviction that the court had erred would justify the setting aside or modification of its finding.   A careful review of the testimony, while not removing all doubts as to the correctness of the conclusion reached, has not satisfied us that error was committed.   The judgment is therefore affirmed.